# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KEN ZUPP,

    Plaintiff,

    v.

CABOT OIL & GAS CORPORATION,

    Defendant.

CIVIL ACTION NO. 3:CV-12-2333

(JUDGE CAPUTO)

## **MEMORANDUM**

Presently before the Court is Cabot Oil & Gas Corporation's ("Cabot") Motion to Dismiss Plaintiff Ken Zupp's ("Zupp") Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 10.) Because the facts as alleged in the Amended Complaint fail to state a claim upon which relief can be granted, Cabot's motion to dismiss will be granted.

## I. Background

### A.    Factual Allegations

The facts as alleged in the Amended Complaint are as follows:

Zupp is the owner of certain real estate located within Susquehanna County, Pennsylvania. (*Am. Compl.*, ¶ 1.) On or about April 3, 2007, Zupp leased the premises to Cabot for purposes of exploring and producing oil and gas pursuant to an Oil and Gas Lease (the "Lease"). (*Id*. at ¶ 3.) The primary term of the lease was five (5) years, which expired on April 2, 2012. (*Id*. at ¶¶ 4, 10.)

On March 1, 2012, Cabot spudded a gas well on Zupp's property. (*Id*. at ¶ 18.) Drilling on Zupp's property was completed as of April 2, 2012, and the drilling rig was released. (*Id*. at ¶ 19.) Cabot embarked upon completion of the well on Zupp's property on May 15, 2012, approximately forty-three (43) days after the expiration of the primary term. (*Id*. at ¶ 20.) The well was completed on June 2, 2012. (*Id*. at ¶ 21.) Since June 2, 2012, Cabot has not conducted operations on Zupp's property. (*Id*. at ¶ 22.) Cabot has asserted to Zupp that that the well has been "shut-in." (*Id*.)

On or about June 4, 2012, Cabot recorded a Declaration of Pooling and Utilization that included approximately 87 acres of Zupp's property, which Cabot subsequently amended on September 27, 2012. (*Id.* at ¶¶ 11-12.) In or about July 2012, Zupp contacted a Cabot representative to inquire why his neighbor received a lease extension in May 2012. (*Id.* at ¶¶ 13-14.) Zupp also discussed with Cabot's representative whether his Lease remained in effect. (*Id.* at ¶¶ 16-17.) While the representative indicated to Zupp that the Lease may have expired, he informed Zupp that he would need to get a definitive answer on the issue. (*Id.* at ¶ 17.) Ultimately, the Cabot representative told Zupp that he was advised that the Lease did not expire. (*Id.*) According to Cabot, the Lease was extended beyond its primary term based on the activities that occurred on Zupp's property in May and June 2012. (*Id.* at ¶ 24.)

**B.      Relevant Lease Provisions**

The Lease agreed to by the parties provides:

> This lease shall remain in force for a term of five (5) years from [April 3, 2007] (called "primary term") and as long thereafter as oil or gas is produced, or considered produced under the terms of this lease, in paying quantities from the premises or from lands pooled therewith, or the premises are used for gas storage purposes as provided in paragraph 6 hereof, or this lease is maintained in force under any subsequent provisions hereof.

(*Am. Compl.*, Ex. A, "*Lease*", ¶ 2.) The parties agree that paragraphs 4 and 12 of the Lease are the pertinent provisions for resolving the instant motion. Paragraph 12 states:

> If during the last ninety (90) days of the primary term hereof or at any time after the expiration of the primary term, production of oil and gas in paying quantities from the premises, or lands pooled therewith, should cease for any reason, or if during or after such ninety (90) day period and prior to discovery of oil or gas on the premises or lands pooled therewith, Lessee should complete a dry hole thereon, this lease shall not terminate if Lessee commences or resumes additional operations on the premise or lands pooled therewith, within ninety (90) days after production ceased or the well was completed as a dry hole, which is applicable. If, at the expiration of the primary term, oil or gas is not being produced in paying quantities from the premises, or lands pooled therewith, but Lessee is then engaged in operations thereon, this lease shall remain in force so long as operations are prosecuted (whether on the same or different wells) with no cessation of more than ninety (90) consecutive days, and if they result in production, so long thereafter as oil or gas is producing in paying quantities from the premises or lands pooled

therewith. The term "operations" as used in this Lease shall include but not be limited to the drilling, testing, completing, (including by horizontal and slant hole well completion techniques) reworking, recompleting, deepening, plugging back, or repairing of a well (and all work preparatory, incident or related to any such operations) in search for or in an endeavor to obtain, restore, maintain, or to increase production of oil, liquid hydrocarbon, or gas, or any of them.

(*Id*. at ¶ 12.)

Paragraph 4 provides in its entirety:

If at any time either during or after the primary term hereof there is a well capable of producing gas (with or without condensate) in paying quantities (other than stored gas) located upon the premises or on lands pooled therewith but such well is shut-in (whether before or after production) and this lease is not maintained in force by operations or production at any well, by gas storage, or by other activity or event, nevertheless it shall be considered that gas is being produced in paying quantities within the meaning of this lease. On or before the end of the initial year during which this lease is maintained in force for the entire annual period under this paragraph 4, Lessee shall pay or tender to Lessee hereunder, or to those entitled to the royalties provided in this lease (as shown by Lessee's records) at the addresses shown by Lessee's records, a shut-in royalty equal to $1.00 per acre for the acreage under this lease (as shown by Lessee's records) at the time such payment or tender is made. Each subsequent payment or tender shall be made thereafter in like manner and amount on or before the end of each annual period while the lease was maintained in force for the entire annual period under the first sentence of this paragraph 4. Lessee's failure to timely or correctly pay or tender the shut-in royalty for any year shall not operate to terminate this lease or serve as a basis for cancellation, but Lessee shall correct any erroneous payment or tender, when notified thereof, and if late then Lessee shall make the correcting payment or tender with interest at the rate of eight (8%) per annum to those to whom such shut-in royalty was not timely or correctly paid or tendered. As long as any well is shut-in, it shall be considered for the purposes of maintaining this lease in force that gas is being produced in paying quantities and this lease shall continue in effect both before and after the primary term.

(*Id*. at ¶ 4.)

**C.  Procedural History**

On or about November 14, 2012, Zupp commenced the instant action in the Court of Common Pleas of Susquehanna County, Pennsylvania . (Doc. 1, ¶ 1.) Cabot removed the action to this Court on November 21, 2012. (*Id*.) The Amended Complaint was subsequently filed on January 10, 2013. (*Am. Compl*.) Cabot filed the instant motion to dismiss on January 24, 2013. (Doc. 10.) After the motion was fully briefed, oral argument was held on May 3, 2013. Now, Cabot's motion to dismiss is ripe for disposition.

3

## II. Discussion

### A. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion, the Court's role is limited to determining if a plaintiff is entitled to offer evidence in support of their claims. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000). The Court does not consider whether a plaintiff will ultimately prevail. *See id*. A defendant bears the burden of establishing that a plaintiff's complaint fails to state a claim. *See Gould Elecs. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000).

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The statement required by Rule 8(a)(2) must give the defendant fair notice of what the . . . claim is and the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (per curiam) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). Detailed factual allegations are not required. *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955. However, mere conclusory statements will not do; "a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Instead, a complaint must "show" this entitlement by alleging sufficient facts. *Id*. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009). As such, "[t]he touchstone of the pleading standard is plausability." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

The inquiry at the motion to dismiss stage is "normally broken into three parts: (1)

identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

Dismissal is appropriate only if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, 127 S. Ct. 1955, meaning enough factual allegations "'to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element. *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556, 127 S. Ct. 1955). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 677, 129 S. Ct. 1937. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679, 129 S. Ct. 1937.

In deciding a motion to dismiss, the Court should consider the allegations in the complaint, exhibits attached to the complaint, and matters of public record. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). The Court may also consider "undisputedly authentic" documents when the plaintiff's claims are based on the documents and the defendant has attached copies of the documents to the motion to dismiss. *Id*. The Court need not assume the plaintiff can prove facts that were not alleged in the complaint, *see City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 & n.13 (3d Cir. 1998), or credit a complaint's "'bald assertions'" or "'legal conclusions.'" *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429–30 (3d Cir. 1997)).

**B.     Zupp Fails to State a Claim**

The instant action is predicated on the parties' dispute over the meaning of the Oil and Gas Lease.  Under Pennsylvania law, oil and gas leases are governed by general principles of contract law and interpretation. *See Roth v. Cabot Oil & Gas Corp.*, - - - F. Supp. 2d - - -, 2013 WL 358176, at *16 (M.D. Pa. Jan. 30, 2013); *Penneco Pipeline Corp. v. Dominion Transmission, Inc.*, No. 05-49, 2007 WL 1847391, at *12 (W.D. Pa. June 25, 2007) (citing *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385, 389-90 (Pa. 1986) (citation omitted); *J.K. Willison v. Consol. Coal Co.*, 536 Pa. 49, 637 A.2d 979, 982 (Pa. 1994) (citation omitted); *Aye v. Philadelphia Co.*, 193 Pa. 451, 44 A. 555, 556 (Pa. 1899)).  A lease must be construed in accordance with its terms as expressly manifested, and "[t]he accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement." *Willison v. Consolidation Coal Co.*, 536 Pa. 49, 54, 637 A.2d 979, 982 (1994) (citing *Amoco Oil Co. v. Snyder*, 505 Pa. 214, 220, 478 A.2d 795, 798 (1984)).  "'It is well established that the intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement.'" *Id*. (quoting *Steuart v. McChesney*, 498 Pa. 45, 48-49, 444 A.2d 659, 661 (1982)).  "The task of interpreting a contract is generally performed by a court, rather than by a jury." *See Roth*, 2013 WL 358176, at *17 (quoting *Benchmark Grp., Inc. v. Penn Tank Lines, Inc.*, 612 F. Supp. 2d 562 (E.D. Pa. 2009)); *see also Hewes v. McWilliams*, 412 Pa. 270, 275, 194 A.2d 339, 342 (1963) ("Where the meaning of a contract is clear and unambiguous, its interpretation and construction are for the court, not the jury.").

Cabot maintains that the Complaint fails to state a claim because the Lease was initially extended by the "continuous operations" provision of paragraph 12, and it currently

6

remains in effect pursuant to the "shut-in" provision of paragraph 4. In opposition, Zupp insists that the shut-in provision does not extend the Lease when, like here, the well was shut-in after the primary term while it was held in effect by "operations."

**1. The Lease was Initially Extended by Paragraph 12 Based on the Allegations in the Amended Complaint**

In pertinent part, paragraph 12 of the Lease states:

> If, at the expiration of the primary term, oil or gas is not being produced in paying quantities from the premises, or lands pooled therewith, but Lessee is then engaged in operations thereon, this lease shall remain in force so long as operations are prosecuted (whether on the same or different wells) with no cessation of more than ninety (90) consecutive days, and if they result in production, so long thereafter as oil or gas is producing in paying quantities from the premises or lands pooled therewith.

(*Lease*, ¶ 12.) "Operations" is defined by paragraph 12 to include "drilling, testing, completing, (including by horizontal and slant hole well completion techniques) reworking, recompleting, deepening, plugging back, or repairing of a well (and all work preparatory, incident or related to any such operations) in search for . . . ." oil or gas. (*Id*.)

Zupp alleges Cabot spudded a gas well on his property prior to the expiration of the Lease's primary term. (*Am. Compl.*, ¶ 18.) As of April 2, 2012, the expiration date of the primary term, drilling on his property is alleged to have been completed and the drilling rig released. (*Id*. at ¶¶ 10, 19.) On May 15, 2012, forty-three (43) days after the expiration of the primary term, Cabot is averred to have embarked upon the completion of the well. (*Id*. at ¶ 20.) The well was completed on June 2, 2012. (*Id*. at ¶ 21.)

Under the facts as alleged in the Amended Complaint, the Lease was extended beyond the primary term. Cabot is alleged to have spudded a well in March 2012, and as of April 2, 2012, drilling was completed and the rig released. (*Am. Compl.*, ¶¶ 18-19.) As Zupp's allegations of Cabot's activities on his premises at the expiration of the primary term constitute "operations" under the Lease, it remained in force beyond April 2, 2012. Additionally, as alleged by Zupp, the longest period Cabot ceased "operations" on his

7

premises following the expiration of the primary term before finishing the well was the forty-three (43) day period until Cabot commenced completion of the well (*i.e.*, from April 2, 2012 to May 15, 2012). (*Id.* at ¶¶ 20-21.) Shortly thereafter, on June 2, 2012, the well was completed, the last of Cabot's alleged activities satisfying the definition of "operations" under the Lease. (*Id.* at ¶ 21.) Thus, pursuant to paragraph 12, the Lease remained in effect until ninety (90) days following the June 2, 2012 completion of the well under the facts as alleged in the Amended Complaint.

From Zupp's Amended Complaint and his submission opposing Cabot's motion to dismiss, it appeared as though he conceded that Lease was extended by "operations" under paragraph 12, as he specifically stated that "the facts set forth in the Amended Complaint demonstrates that the latest date through which paragraph 12 could have served to extend the lease by 'operations' is August 31, 2012- ninety days after the cessation of 'operations.'" (Doc. 15, 5-6.) At oral argument, though, Zupp advanced a different position, and he maintained that the Amended Complaint also asserts a claim that the Lease may not have been extended beyond the primary term. Specifically, Zupp argued that it is unknown at this time whether Cabot was engaged in "operations" on his premises on April 2, 2012. And, if "operations" were not ongoing on April 2, 2012, Zupp suggested that the Lease was not extended under paragraph 12. When viewed in its entirety, however, the Amended Complaint does not alternatively plead this claim. Rather, it alleges only that "operations" were being conducted on his premises at the end of the primary term.[1] Zupp, therefore, fails to state a claim based on the alternative position he identified at oral argument.

---

[1] Of course, Zupp is allowed to plead his claims in the alternative. *See* Fed. R. Civ. P. 8(d)(2). But, the sole averment Zupp cited at oral argument to support the alternative claim that Cabot was not engaged in "operations" on April 2, 2012 is unclear and by itself does not show an entitlement to relief under such a theory. (*Am. Compl.*, ¶ 19 ("As of April 2, 2012, drilling on Plaintiff's property had been completed and the drilling rig was released.").)

### 2. The Lease Remains in Effect Through Paragraph 4 Based on the Allegations in the Amended Complaint

According to Cabot, the Lease remains in force currently pursuant to paragraph 4 of the Lease.[2] Paragraph 4 provides, in pertinent part:

> If at any time either during or after the primary term hereof there is a well capable of producing gas (with or without condensate) in paying quantities (other than stored gas) located upon the premises or on lands pooled therewith but such well is shut-in (whether before or after production) and this lease is not maintained in force by operations or production at any well, by gas storage, or by other activity or event, nevertheless it shall be considered that gas is being produced in paying quantities within the meaning of the lease. . . . As long as any well is shut-in, it shall be considered for the purposes of maintaining this lease in force that gas is being produced in paying quantities and this lease shall continue in effect both before and after the primary term.

(*Lease*, ¶ 4.)

Accepting Zupp's allegations as true, Cabot argues that it is undisputed that "operations" commenced on Zupp's property prior to the expiration of the primary term, that "operations" did not cease for more than ninety (90) days before the well was completed, and upon completion on June 2, 2012, the well was shut-in. (Doc. 11, 15.) Paragraph 4, Cabot contends, holds a lease in force after a well is shut-in, regardless of whether the shut-in occurred during or after the primary term. Since the well was shut-in while the Lease was maintained in force by way of "operations" under paragraph 12, Cabot concludes that the Lease currently remains in effect by way of the shut-in provision.

In opposition, Zupp argues that Cabot distorts the plain language of paragraph 4 of the Lease and incorrectly characterizes the allegations set forth in the Amended Complaint. As to the allegations in his pleading, Zupp contends that Cabot's motion to dismiss must be denied based on "factual disputes" regarding: (1) whether Cabot actually shut-in the well on June 2, 2012; and (2) whether the well on his property is even capable of producing gas.

---

[2] Since Cabot relies only on paragraph 4 to support its position that the Lease currently remains in effect, Zupp's arguments as to why the Lease is not presently in effect under paragraph 12 need not be addressed.

9

(Doc. 15, 8 n.3, 12 n.5.) The Amended Complaint, however, is devoid of averments that the well is, in fact, not shut-in, or that the well is incapable of producing gas in paying quantities. With respect to paragraph 4, Zupp asserts that the provision "and this Lease is not maintained in force by operations or production" prevents the shut-in of a well from maintaining the Lease in force if the shut-in occurred beyond the primary term while the Lease was held in effect by "operations." Paragraph 4, as stated by Zupp, merely "expand[s] the concept of paying quantities to a shut-in well in those situations where the Lease is not being 'maintained in force by operations or production.' It has no applicability where, as here, the Lease was, at the time of purported shut-in, being maintained by 'operations.'" (Doc. 15, 13.)

In regard to the claimed "disputed questions of fact," (Doc. 15, 8 n.3), "[t]he Court need not assume the plaintiff can prove facts that were not alleged in the complaint." *Berish v. Sw. Energy Prod. Co.*, 763 F. Supp. 2d 702, 704 (M.D. Pa. 2011) (citing *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 & n.13 (3d Cir. 1998). Although the allegations in the Amended Complaint are accepted as true, the Court will not assume that Zupp can prove those facts that he has not alleged, *i.e.*, that the well is incapable of producing gas in paying quantities or that the well is not shut-in.

As to the meaning of paragraph 4, I agree with Cabot that the shut-in provision is clear and unambiguous, and that the interpretation of paragraph 4 offered by Zupp strains the shut-in provision's plain language. Paragraph 4, when read in its entirety, sets forth the lessee's obligations depending on whether the lease is maintained in force by the shut-in provision, or, alternatively, based on operations, production, gas storage, or some other activity or event. The language "and this Lease is not maintained in force by operations or production at any well, by gas storage, or by other activity or event" (*Lease*, ¶ 4) in paragraph 4 "refer[s]to the maintenance of the lease in force other than by shut-in royalty

payments." 3 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* § 632.14 (2012). That is, the provision is meant to show "that the payment of shut-in royalty is not required as a condition to holding a lease in effect at any time when the lease is being preserved by production, operations, *force majeure*, or otherwise." *Id*. Thus, the language of paragraph 4 serves to "negate any implication that the payment of shut-in royalty may be a condition precedent to holding the lease in effect at a time when it is being held by some other provision or condition." *Id*.

Zupp offers a different interpretation of paragraph 4. According to Zupp, "and this Lease is not maintained in force by operations or production," means that the shut-in provision cannot apply if the shut-in occurred beyond the primary term while the Lease was maintained in effect by "operations." Zupp suggests that this reading is consistent with the entirety of paragraph 4 because there are "numerous situations" in which the Lease could be extended beyond its primary term for reasons other than continued "operations." For example, the Lease could be extended under paragraph 14 by way of an act of God, labor dispute, or other event beyond the control of Cabot. (Doc. 15, 14 (citing *Lease*, ¶ 14). And, if the Lease was extended for any of these non-operations reasons, a shut-in beyond the primary term in these situations would still serve to hold the Lease in full force according to Zupp.

Zupp's construction and explanation of paragraph 4, however, is not plausible when the phrase he relies on is considered in context and in its entirety. Specifically, as quoted above, the relevant phrase in paragraph 4 provides: "and this Lease is not maintained in force by operations or production at any well, by gas storage, or *by other activity or event*." (*Lease*, ¶ 4 (emphasis added).) Taking the phrase in its entirety into account, Zupp's interpretation would not allow any shut-in of a well beyond the primary term to maintain the Lease in effect, even if the Lease was initially held in force pursuant to one of the

11

"numerous situations" identified by Zupp, because these situations, for example a labor dispute, would qualify as an "other activity or event" under paragraph 4. Consequently, Zupp's interpretation of paragraph 4 allows the shut-in provision to maintain the Lease in effect if, and only if, the shut-in occurs during the Lease's primary term.

This interpretation cannot be reconciled with the introductory language of paragraph 4. The provision's opening sentence unambiguously states that it applies to a well capable of producing gas that is shut-in "at any time either during or *after* the primary term hereof." (*Lease*, ¶ 4 (emphasis added).) As Zupp's interpretation ignores this introductory clause, it cannot be accepted since it fails to attempt to give effect to all the Lease's provisions, *see, e.g., Gaffer Ins. Co. v. Discover Reinsurance Co.*, 936 A.2d 1109, 1115 (Pa. Super. 2007), and essentially nullifies part of the Lease. *See Capek v. Devito*, 564 Pa. 267, 274, 767 A.2d 1047, 1050 (2001) ("An interpretation will not be given to one part of the contract which will annul another part of it.").

Accordingly, consistent with its unambiguous language, the Lease currently remains in effect based on the factual allegations in the Amended Complaint. Under Zupp's averments, the well on his property was shut-in while the Lease remained in force pursuant to the "operations" provision of paragraph 12. And, because the Lease allows a shut-in beyond the primary term to maintain the Lease in effect, the Lease remains in force under its clear terms and the facts as alleged by Zupp. The Amended Complaint therefore fails to state a claim upon which relief can be granted.

### III. Conclusion

For the above stated reasons, Cabot's motion to dismiss will be granted. However, the Third Circuit has instructed that a district court must permit a curative amendment if a claim is vulnerable to a 12(b)(6) dismissal, unless amendment would be inequitable or futile. *See Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 236 (3d Cir. 2008). Because it is not

certain that amendment would be futile, Zupp will be permitted one opportunity to amend his pleading to state a claim consistent with this Memorandum.

    An appropriate order follows.


| | |
|---|---|
| May 9, 2013<br>Date | /s/ A. Richard Caputo<br>A. Richard Caputo<br>United States District Judge |